510

693 A.2d 500

ALLSTATE INSURANCE CO., PLAINTIFF–RESPONDENT,
v. ORTHOPEDIC EVALUATIONS, INC., DEFENDANT–
APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued September 9, 1996—Decided May 2, 1997.

Before HAVEY, BROCHIN and KESTIN, JJ.

*Steven Pontell* argued the cause for appellant (*Verde, Steinberg & Pontell,* attorneys; *Mr. Pontell,* of counsel; *Ronald A. Berutti,* on the brief).

*Peter P. Green* argued the cause for respondent (*Green, Lundgren & Ryan,* attorneys; *Mr. Green,* of counsel; *Frank P. Brennan* and *Colleen M. Mackuse,* on the brief).

The opinion of the court was delivered by

KESTIN, J.A.D.

This appeal presents the question whether a provider's compliance with the regulatory standards of the Board of Medical Examiners for diagnostic centers and medical screening and diagnostic testing services, *N.J.A.C.* 13:35–2.5, is required in order to qualify particular services for reimbursement under *N.J.S.A.* 39:6A–2, –4 and –5, provisions of the Automobile Reparation Reform Act (*N.J.S.A.* 39:6A–1 to –35) (the Act) governing personal injury protection (PIP) coverage. The case began with plaintiff's (Allstate) complaint for a declaratory judgment filed in Burlington County. Defendant (OEI) subsequently filed complaints in several other counties seeking related relief. The latter matters were transferred to Burlington County for consolidation with the declaratory judgment action.

OEI appeals from the trial court's orders disposing of the parties' respective motions for summary judgment as well as OEI's motions for other relief. In granting Allstate's motion seeking favorable disposition of its claim for declaratory relief, the trial court held that the services rendered by OEI were not eligible for PIP reimbursement because they were furnished by an entity that did not meet the requirements of *N.J.A.C.* 13:35–2.5(a)3 for a "diagnostic center", or those of *N.J.A.C.* 13:35–2.5(b) for the medical screening or diagnostic testing performed. In addition to denying OEI's motion for summary judgment, the trial court also denied its motions for transfer of Allstate's cause of action to the Board of Medical Examiners, for transfer of OEI's counterclaim alleging bad faith adjustment of PIP claims to the Department of Insurance, for a preliminary injunction, and for *pendente lite* mandatory relief requiring payment of the PIP claims which were the subject matters of the consolidated actions.

OEI operates mobile testing services for evaluating orthopedic injuries. It maintains its testing equipment on a truck that is driven to physicians' offices on request. Three types of machines are involved: a dual inclinometer records the range of motion of the spine; an Arcon CX provides data concerning the comparative strengths or weaknesses of muscles in the upper body or cervical area; a B200 offers data for diagnosis of lower back/lumbar injuries. The tests are administered by a staff of exercise physiologists.

In an oral ruling, Judge Sweeney articulated his findings and reasons for granting Allstate's motion for summary judgment and denying OEI's:

I am entirely satisfied from everything that I have read in the filings by OEI that it is, in fact, a medical diagnostic testing service, that it renders reports, that some of its reports even go so far as to recommend various types of medical treatment. I am satisfied that since it is a medical diagnostic testing ... service which is mobile in nature, that it must comply with NJAC 13:35–2.5(b) which provides ... that it is a diagnostic testing procedure "conducted primarily for persons not receiving medical treatment from the testing entity." The facts in this case clearly bear that out. The claim has never been made by Allstate, nor is it made by OEI, that these mobile facilities render any type of medical treatment. But it goes on to say, that it "is nevertheless deemed to be a medical service," and, as such, "such a practice shall be owned and under the responsibility of one or more physicians, each of whom holds a plenary license from the State Board of Medical Examiners."

Here, from the testimony of Mr. Brettler, ... he owns nothing but Mrs. Brettler owns in excess, I believe, of 95 percent of the stock but he acts as the spokesman, the president or whatever it is because in his words she is a woman and she doesn't have the credibility or can't be as assertive as he can and so he, in effect, runs the business. He says that he hired or that they are somehow in partial ownership of this company with Dr. Riviello, a doctor who is in the family practice in Harvey Cedars on Long Beach Island, New Jersey, who allegedly does something a few times a year with respect to personnel and some quality control. He is not, and can't be considered under any definition of the word ownership, in control of or dominion of being over this company. The boss, the person who operates it clearly is Mr. Brettler. I mean, he makes no bones about it, he runs the operation. Dr. Riviello is nothing more than a one percent shareholder for convenience and in an attempt to comply with the provisions of this code. I find as a fact that it does not comply because he does not have dominion and control, cannot make decisions for this company and apparently has not made decisions in the past.

The regulation goes on to say: "All such testing, irrespective of the stationary or mobile nature of the facility, shall be performed under the authority of a designated

responsible physician who shall establish a protocol and a quality assurance program for the specific type of screening or study." I've read Dr. Riviello's certification, I am not satisfied by any stretch of the imagination that what he does complies with that provision. These tests are not made under the authority nor, are reports issued under the authority of, or interpreted by, any doctor whatsoever. In my opinion, the people doing the testing, who recommend forms of medical treatment, are practicing medicine in an unauthorized fashion.

█ The facts of the matter as found by Judge Sweeney are essentially undisputed. Although OEI contends that the trial court erred in granting Allstate's motion for summary judgment because genuine issues of material fact were in dispute, it isolates no such issues.[1] It argues, instead, that it is not required to comply with *N.J.A.C.* 13:35–2.5. This is an issue of law, subsumed in the question now before us. By way of a hedge, OEI also asserts that it "voluntarily complies" with the regulation. In this connection, it offers no reference to factual allegations beyond those found by the trial judge, leaving us with the responsibility of determining only whether the facts as found by the trial court support the conclusion it reached in respect of the compliance question. Analysis of the record discloses that the trial judge faithfully discharged his responsibilities on the cross-motions for summary judgment when he based his conclusions of law on undisputed facts. *Brill v. Guardian Life Ins. Co.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995). He determined that the mode of organization and operation described in OEI's very own submissions did not meet regulatory standards to qualify it as a conforming diagnostic center or other provider of medical screening or diagnostic testing. That legal ruling was unquestionably correct.

---

[1] We take this opportunity to observe upon the responsibilities of a party which argues on appeal that genuine issues of material fact precluded the grant of its adversary's cross-motion for summary judgment, after the appealing party had also, but unsuccessfully, moved for summary judgment, necessarily asserting that no genuine issue of material fact existed. Although it is not uncommon that the fact-issue qualities of a case will permit the entry of summary judgment for one party but not for another, when an appeal is based upon this apparent contradiction, it is incumbent upon the party advancing the argument to make it with precision and factual specificity. OEI has not done so here.

■ The question we now address is whether OEI's lack of compliance with the standards promulgated by the Board of Medical Examiners disqualified the services rendered from eligibility for PIP reimbursement. No issue is raised whether the diagnostic tests performed by OEI categorically qualify for PIP coverage, *see Thermographic Diagnostics, Inc. v. Allstate Ins. Co.,* 125 *N.J.* 491, 507–14, 593 *A.*2d 768 (1991), or whether the fees charged were reasonable, *see id.* at 514–18, 593 *A.*2d 768. The sole issue before us is the eligibility of such services for PIP reimbursement when rendered by OEI. Defendant would have us hold that any diagnostic service which meets the statutory test alone, as applied in *Thermographic,* is reimbursable without reference to any other legal standards.

*N.J.S.A.* 39:6A–2e defines medical expenses under the Act to include those

> for medical treatment, surgical treatment, dental treatment, professional nursing services, hospital expenses, rehabilitation services, X-ray and other diagnostic services, prosthetic devices, ambulance services, medication and other reasonable and necessary expenses resulting from the treatment prescribed by persons licensed to practice medicine and surgery pursuant to R.S. 45:9–1 et seq., dentistry pursuant to R.S. 45:6–1 et seq., psychology pursuant to P.L.1966, c. 282 (C. 45:14B–1 et seq.) or chiropractic pursuant to P.L.1953, c. 233 (C. 45:9–41.1 et seq.) or by persons similarly licensed in other states and nations or any nonmedical remedial treatment rendered in accordance with a recognized religious method of healing.

The Supreme Court in *Thermographic* provided the following gloss:

> [A] necessary medical expense under the Act is one incurred for a treatment, procedure, or service ordered by a qualified physician based on the physician's objectively reasonable belief that it will further the patient's diagnosis and treatment. The use of the treatment, procedure, or service must be warranted by the circumstances and its medical value must be verified by credible and reliable evidence.
>
> [*Thermographic, supra,* 125 *N.J.* at 512, 593 *A.*2d 768.]

Under the provisions of the Act as interpreted in *Thermographic,* therefore, the judgment of the treating health professional in choosing a diagnostic or treatment modality tends to control. Where, however, the State has elected, under other aegises, to regulate particular procedures or types of procedure by establishing standards governing any aspect of their existence or operation,

public policy would be frustrated if non-conforming activities were to prosper through the choices of others, even treating physicians.

■ A fair reading of the Act in the light of other provisions of law regulating the qualifications of entities rendering medical services, governed by a commitment to promote consistency of application among provisions relating to associated subjects, *see Safeway Trails, Inc. v. Furman,* 41 *N.J.* 467, 483, 197 *A.*2d 366, *appeal dismissed and cert. denied,* 379 *U.S.* 14, 85 *S.Ct.* 144, 13 *L.Ed.*2d 84 (1964); *Gualano v. Board of Sch. Estimate,* 72 *N.J.Super.* 7, 22–23, 177 *A.*2d 580 (Law Div.1962), *aff'd,* 39 *N.J.* 300, 188 *A.*2d 569 (1963), requires the conclusion that any healthcare service authorized by the Act, in order to be eligible for recognition, must also comply with any other significant qualifying requirements of law that bear upon rendition of the service. Providers and services included within the ambit of *N.J.S.A.* 39:6A–2e, which are not regulated in any other way, are governed by a simple application of the "reasonable and necessary" test expounded upon in *Thermographic.* But, it is only logical that providers and services which are covered by other requirements of law must conform with pertinent norms as a precondition for eligibility under the Act.

■ From the standpoint of public policies having to do with the rendition of health services, it is of no significance that the regulatory provisions at issue embody performance standards for licensed physicians and are not licensing criteria for the diagnostic facilities involved or the services they provide. *See* 23 *N.J.R.* 2858 (September 16, 1991). The Board of Medical Examiners stated its concerns with clarity in announcing the current version of *N.J.A.C.* 13:35–2.5(a)3 and (b):

> The Board is also encountering situations where medical practice is conducted from mobile facilities sponsored (especially of radiologic services) by physicians but staffed and operated on a day-to-day basis almost entirely by non-physicians including licensed x-ray technologists and non-licensed personnel who are sometimes left to make medical decisions properly made only by physicians. Still other situations are coming to Board attention where ordinary general business corporations are purporting to set up and offer medical services, hiring physicians to provide some of the services but having major decision- and policy-making done by

non-licensed businesspersons. The Board believes such incorporations for the delivery of medical services to be improper. Such services should, with limited exceptions, be marketed through corporations complying with the Professional Service Corporations Act, *N.J.S.A.* 14A:17-1 et seq., which permits incorporation of an individual or group of individuals to render professional services to the public for which such individuals are required by law to be licensed or to obtain other legal authorization.

[23 *N.J.R.* 2858 (September 16, 1991).]

The law should accord no recognition to such entities and operations which place the public at risk by failing to provide the professional supervision and control deemed essential by the Board.[2] A contrary result would tend to encourage nullification of the public policies underlying the regulation of health services. It would also create an anomaly in the application of *N.J.S.A.* 39:6A–2e: while the healthcare providers who prescribe authorized procedures or services are required to be licensed, a procedure or service prescribed, although the subject of regulatory norms, would not be required to conform to promulgated standards.

On the record before us, there can be no question that OEI is a medical diagnostic testing facility which does not meet the regulatory requirements that it "shall be owned and under the responsibility" of a licensed physician, or that all the testing it does "shall be performed under the authority of a designated responsible physician who shall establish a protocol and a quality assurance program for the specific type of screening or study." *N.J.A.C.* 13:35–2.5(b). By application of the foregoing reasoning, therefore, the diagnostic services rendered by OEI do not qualify for PIP reimbursement.

We regard as meritless OEI's arguments that the trial court should have transferred certain issues in the case to the administrative agencies with primary subject matter interest. Specifically, OEI argues that questions concerning its compliance with *N.J.A.C.* 13:35–2.5 should have been referred to the Board of

---

[2] We emphasize that there has been no finding in this case that the patients evaluated by OEI were disserved; only that OEI failed to conform with the protective measures required by the Board.

Medical Examiners; and questions relating to the manner in which Allstate processes claims for PIP reimbursement should have been given over to the Department of Insurance.

Basic separation of powers principles prohibit a court from sharing its decision-making responsibilities with an entity in another branch of government. *N.J. Const.* art. III, ¶ 1; *see Massett Bldg. Co. v. Bennett*, 4 *N.J.* 53, 56–58, 71 *A.*2d 327 (1950). It is not as if the specialized questions involved were severable from the other issues in dispute, so that the court could have rendered a full and final decision as to those matters properly before it, and then transferred remaining issues to the administrative bodies involved for full and final decision as to those issues committed to their expertise. *See, e.g., Board of Educ. v. Asbury Park Educ. Ass'n,* 155 *N.J.Super.* 76, 382 *A.*2d 392 (App.Div.1977). The question of whether or not OEI met the form and function requirements of *N.J.A.C.* 13:35–2.5 was integral to the basic issues before the trial court, and the Board of Medical Examiners lacked jurisdiction over the PIP eligibility issue. The only forum with jurisdictional sweep broad enough to decide the basic controversy was the trial court, which was no less equipped to interpret and apply the standards embodied in the regulation than it was to interpret and apply the statute.

OEI, on its own initiative, could have sought a declaratory ruling from the Board of Medical Examiners concerning the application of the regulation. *See N.J.S.A.* 52:14B–8. It did not do so. If there were any issues of regulatory control that should have come before the Commissioner of Insurance, OEI was free to raise such matters in an administrative proceeding. Instead, it sought to litigate claims for PIP reimbursement in the trial courts, and to raise, in those matters, questions related to Allstate's refusal to pay. As the issues were framed, in the absence of an unambiguous commitment of subject matter jurisdiction to an administrative agency, *see Alexander's Dep't Stores, Inc. v. Borough of Paramus,* 125 *N.J.* 100, 113–116, 592 *A.*2d 1168 (1991); *Kohlbrenner Recycling Enter., Inc. v. Burlington County Bd. of*

*Chosen Freeholders*, 248 *N.J.Super.* 531, 536–39, 591 *A.2d* 962 (App.Div.), *certif. denied*, 127 *N.J.* 551, 606 *A.2d* 364 (1991); *Magliochetti v. State*, 276 *N.J.Super.* 361, 375–76, 647 *A.2d* 1386 (Law Div.1994), the trial court possessed all the jurisdictional authority necessary to conclude, fully and finally, the dispute before it. *See Abbott v. Burke*, 100 *N.J.* 269, 297–300, 495 *A.2d* 376 (1985); *Feiler v. New Jersey Dental Ass'n*, 191 *N.J.Super.* 426, 434–35, 467 *A.2d* 276 (Ch.Div.1983), *aff'd*, 199 *N.J.Super.* 363, 489 *A.2d* 1161 (App.Div.), *certif. denied*, 99 *N.J.* 162, 491 *A.2d* 673 (1984); *Grillo v. Board of Realtors*, 91 *N.J.Super.* 202, 212–13, 219 *A.2d* 635 (Ch.Div.1966).

Affirmed.